UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KENNETH GRAHAM,

    Defendant.
_____/

Case No. 21-cr-20433

Paul D. Borman
United States District Judge

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (ECF No. 24)

### FACTS

On April 23, 2021, Police Officers Cameron Burks and Clinton Elam were "conducting a special attention to" K&G Deli and Liquor Store. (ECF No. 27-2, Incident Report, PageID 118–19.) They were in the back of the store when Defendant Kenneth Graham came in with the butt of a gun sticking out of his right pocket.[1] The Officers' body cameras captured the events that followed. (ECF No. 27-1.)

Mr. Graham walked up to two of his friends, who were standing a few feet in front of Officer Burks. As Mr. Graham hugged the first of his friends, he looked

---

[1] The gun is visible in Mr. Graham's pocket at the 18 second mark of Officer Elam's body camera video and the 25 and 45 second marks of Officer Burks' body camera video.

1

and nodded in the direction of Officer Burks.[2] As Mr. Graham hugged the second, Officer Burks approached him.[3]

Officer Burks said, "do me a favor," and Mr. Graham immediately raised his hands in a way that suggested that he did not intend to grab the gun or resist. Officer Burks asked, "where your CPL [(concealed pistol license)] at"? And Mr. Graham, with his hands still raised, said, "look I just took this [inaudible] from my son bro."

Officer Burks replied, "ok I hear you," and put his hand on Mr. Graham's chest. Mr. Graham added, "I just took it from him." Officer Burks said "I hear you" again, then moved closer to Mr. Graham and grabbed both of his wrists. Officer Elam took the gun from Mr. Graham's pocket as Mr. Graham continued to reiterate, in a calm voice, that he "just took it from him."

Once more, Officer Burks asked, "you got a CPL for that?" This time, Mr. Graham responded, "no man I, real talk, just took it from my son bro, just took it."

Then Officer Burks said, "do me a favor just for the time being"; Mr. Graham said, "alright you know the drill my man." Mr. Graham turned around with his hands

---

[2] The first thirty seconds of the videos do not have sound, so it is unclear if the Officers said anything to Mr. Graham at this point. The Government asserts that Mr. Graham was nodding in response to Officer Burks asking him if he had a CPL. (ECF No. 27, PageID 98.) But Mr. Graham asserts that that "this conversation never took place." (ECF No. 33, PageID 225.) The Court does not need to resolve this disagreement because the conversation would not affect the analysis that follows.

[3] At this point, the Officers' body camera videos began to record sound.

2

behind his back, Officer Burks handcuffed him, and they left the store. (This entire exchange, from the time Mr. Graham entered the store to the time he was escorted out, lasted about fifty-five seconds.)

Outside, Mr. Graham said, "please don't do this to me, I have everything to lose on this." He explained that he was on probation and has children and a wife. His wife saw him with the Officers and confirmed that he "actually took [the gun] off the streets" and "was doing a good deed."

The Officers removed the contents of Mr. Graham's pockets and noted that he was under arrest.

## PROCEDURAL HISTORY

On June 30, 2021, Mr. Graham was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (ECF No. 10.)

On May 31, 2022, Mr. Graham moved to suppress "all tangible evidence in this case as well as any statements allegedly made by [him] to law enforcement officers" on two grounds. (ECF No. 24, PageID 75.) First, he argued that the "officers did not have reasonable suspicion that [he] was engaged in criminal activity." (ECF No. 24, PageID 79–82) (capitalization removed). Second, he argued that the "officers did not have reason to believe [he] was dangerous." (ECF No. 24, PageID 82–85) (capitalization removed).

The Government responded on July 5 (ECF No. 27), and Mr. Graham replied on July 21 (ECF No. 31). The Court held an evidentiary hearing on August 2. (ECF No. 32.) Both parties submitted supplemental briefs on August 26. (ECF No. 33, 34.)

## ANALYSIS

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (internal quotation marks omitted). Under this standard, "[a]n officer can stop and briefly detain a person [only] when the officer has reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity." *Id.* at 536 (internal alteration and quotation marks and emphasis omitted). "[T]he degree of intrusion" of such a stop must be "reasonably related in scope to the situation at hand." *Id.* at 537 (internal quotation marks omitted). And an officer may "conduct 'a reasonable search for [and seizure of] weapons for his or her protection, [only] where he or she has reason to believe that he or she is dealing with an armed and dangerous individual.'" *Id.* at 542 (internal alteration marks omitted) (quoting *United States v. Terry*, 392 U.S. 1, 27 (1968)).

For the reasons that follow, the Court will **DENY** Mr. Graham's Fourth Amendment-based Motion to Suppress.

4

**1. The Officers had reasonable suspicion that Mr. Graham was committing a crime as soon as they saw the butt of his concealed pistol. This suspicion entitled them to stop Mr. Graham and ask him about whether he had a CPL.**

*Arguments*

Mr. Graham argues that he was seized as soon as Officer Burks asked him where his CPL was. (ECF No. 33, PageID 226.) But, he states, "Officer Burks' assumption that he observed a firearm, without more, could not have created reasonable suspicion that [he] was committing a crime, because in Michigan, it is not a crime to carry a concealed pistol as long as you have a permit." (ECF No. 24, PageID 80) (citing Mich. Comp. Laws 28.425f(1) and (2) and *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013)).

Mr. Graham asserts that in *Northrup* the Sixth Circuit held that "'where it is lawful to possess firearms, unlawful possession is not the default status,'" and thus officers "need evidence of criminality or dangerousness" beyond merely possessing a weapon "before they [may] detain and disarm a law abiding citizen." (ECF No. 24, PageID 81) (quoting *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132 (6th Cir. 2015) (internal quotation and alteration marks omitted) and also citing *United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000) and *Black*, 707 F.3d at 539–40). And he maintains that "[i]t simply cannot be true that observing what appears to be the handle of a pistol automatically gives officers reasonable suspicion

5

to stop and frisk citizens in [a] concealed-carry state." (ECF No. 24, PageID 82) (citing *United States v. House*, 463 F. App'x 783, 789 (10th Cir. 2012)).

The Government responds that "Officer Burks had reasonable suspicion to approach Graham because he could see that Graham was carrying a partially concealed weapon when he saw him in the liquor store" and "carrying a concealed pistol in Michigan is presumptively unlawful." (ECF No. 27, PageID 101) (citing MCL § 750.227(2)). The Government contends that "showing that the defendant carried a pistol . . . concealed on his person[] alone makes out a 'prima facie case,' after which 'the defendant has the burden' of producing some evidence of licensure." (ECF No. 27, PageID 102) (quoting *People v. Henderson*, 391 Mich. 612, 616 (1974) and also citing *People v. Perkins*, 473 Mich. 626 (Mich. 2005) and, in its post-Hearing filing, *People v. Combs*, 160 Mich. App. 666, 673 (1987)).

The Government emphasizes that in *Galaviz* the Sixth Circuit "held that the incriminating nature of [a] pistol was immediately apparent because MCL 750.227(2) makes it unlawful to carry a pistol in a vehicle without a license and MCL 776.20 places the burden on the defendant to produce the license." (ECF No. 27, PageID 103) (citing *United States v. Galaviz*, 645 F.3d 347, 356 (6th Cir. 2011) and *United States v. Williams*, 483 F. App'x 21, 27 (6th Cir. 2012)). Thus, it asserts that under *Galaviz*, "the observation of a concealed pistol doesn't just create reasonable suspicion to justify an investigative stop or frisk: <u>it creates probable cause</u>

to seize the weapon." (ECF No. 34, PageID 247) (citing *Galaviz*, 645 F.3d at 356 and *United States v. Young*, No. 21-cr-20062, 2021 WL 2010387 (E.D. Mich. May 20, 2021)).

The Government states that courts in this District have confirmed that "carrying a concealed pistol in Michigan is presumptively unlawful" and that "[t]hat conclusion is [] dispositive under the Fourth Amendment." (ECF No. 27, PageID 104–05) (citing *United States v. Lamb*, No. 16-20077, 2016 WL 4249193, at *4 (E.D. Mich. July 6, 2016), *report and recommendation adopted*, 2016 WL 4191758 (E.D. Mich. Aug. 9, 2016); *United States v. Stevenson*, No. 21-cr-20375, ECF No. 33, PageID.187 (E.D. Mich. 30, 2021); *United States v. Leverett*, No. 19-cr-20098, ECF No. 36 (E.D. Mich. July 24, 2019). And it adds that other circuit courts have come to the same conclusion. (ECF No. 27, PageID 106–07) (citing *United States v. Pope*, 910 F.3d 413, 416 (8th Cir. 2018); *United States v. Ferguson*, No. 19-3894, 2020 WL 10140803, at *3 (6th Cir. June 3, 2020); and *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010)).

The Government concedes that "where gun possession is presumptively lawful by statute," possession alone is not enough to justify a stop. (ECF No. 27, PageID 106) (citing *Northrup*, 785 F.3d at 1132–33 and *Ubiles*, 224 F.3d at 217); *see also* (ECF No. 34, PageID 239).

7

Mr. Graham replies that the Government's argument "directly contradicts the Supreme Court's rule that there is no 'automatic firearm exception' to the *Terry* rule." (ECF No. 31, PageID 148) (citing *Northrup*, 785 F.3d at 1132 (citing *Florida v. J.L.*, 529 U.S. 266, 272 (2000))). He also emphasizes that "courts must consider the totality of the circumstances," not just "one isolated fact," "when determining the reasonableness of a *Terry* stop." (ECF No. 31, PageID 148–49) (citing *United States v. Urietta*, 520 F.3d 569, 573 (6th Cir. 2008) and *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2008)).

Finally, Mr. Graham argues that *Galaviz* is inapplicable here, because in that case "the gun was found in a car" and was fully in plain view. (ECF No. 31, PageID 149.)

*Analysis*

In *Galaviz*, the Sixth Circuit emphasized that Michigan law "plac[es the] burden of establishing possession of [a] license on" those charged with "carry[ing] a pistol in a vehicle without a firearm license." *Galaviz*, 645 F.3d at 356 (citing MCL § 776.20); *see also Henderson,* 391 Mich. at 616 ("[U]pon a showing that a defendant has carried a pistol in a vehicle operated or occupied by him, prima facie case of violation of the statute has been made out. [Then] the defendant has the burden of injecting the issue of license by offering some proof-not necessarily by official record-that he has been so licensed."). For that reason, it held that as soon as

8

officers observed a handgun in a car "the incriminating nature of [the] []gun . . . was immediately apparent." *Galaviz*, 645 F.3d at 356 (citing MCL § 750.227).

The same Michigan law that criminalizes carrying a pistol in a car without a license also criminalizes carrying a *concealed* pistol without a license. MCL § 770.227. Accordingly, the same burden-allocation framework applies: the Government has a prima facie case that anyone carrying a concealed pistol is violating the law, but the carrier can defeat that case by showing that he or she has a license to do so. MCL § 776.20.

Therefore, under *Galaviz*, the "incriminating nature" of Mr. Graham's concealed pistol was "immediately apparent" to the Officers who saw it. And Mr. Graham does not argue that he gave the Officers any concrete reason to believe that he had a CPL (or any other reason to think that the pistol was not incriminating).[4]

Thus, based on the totality of the circumstances, the Officers had reasonable suspicion that Mr. Graham was carrying a concealed pistol without a license. And this suspicion allowed them to stop Mr. Graham and investigate whether he had a

---

[4] As noted above, Mr. Graham denies that he told the Officers that he had a CPL before their cameras started recording sound. And the fact that Mr. Graham did not appear to hide from or fight with the Officers did not necessarily suggest that he had a CPL and was not enough to dispel the "immediately apparent" "incriminating nature" of the partially-visible concealed pistol.

license.[5] Indeed, other cases in this District have held at least as much in similar circumstances. *See United States v. Capozzoli*, No. 22-20005, 2022 WL 3044818, at *5 (E.D. Mich. Aug. 2, 2022) ("Having *seen* a concealed weapon, the officers had reasonable suspicion to investigate whether Defendant in fact had a firearm on his person, including by approaching him and asking Defendant questions." (emphasis original)); *United States v. Freeman*, No. 21-20390, 2022 WL 1194058, at *5 (E.D. Mich. Apr. 21, 2022) ("The presence of a concealed pistol on the person is sufficient by itself to constitute *probable cause* to believe a person is committing the crime of illegally carrying a concealed weapon under Michigan law." (emphasis added)); *United States v. Mims*, No. 20-20323, 2021 WL 6049406, at *3–4 (E.D. Mich. Dec. 21, 2021) ("The fact that Mims was carrying a firearm presented a formidable reason for the officers to suspect that he was involved in criminal activity because carrying a firearm is presumptively illegal in Michigan."); *United States v. Steen*, No. 21-20012, 2021 WL 5036152, at *5 (E.D. Mich. Oct. 27, 2021) ("Th[e] same Michigan statute [analyzed in *Galaviz*] also makes it a crime to carry a concealed weapon on one's person without a license. So the incriminating nature of the handgun in Steen's waistband was immediately apparent.").

---

[5] To be clear: this section establishes that the Officers had reasonable suspicion to stop Mr. Graham and ask him questions. Therefore, the Court need not consider whether the Officers' initial encounter with Mr. Graham was consensual. The next section considers whether the Officers were entitled to frisk Mr. Graham and remove his weapon.

10

Mr. Graham's arguments to the contrary are unavailing. First, the fact that Officer Burks observed the pistol on Mr. Graham's person rather than in a car does not make a difference here. Just as "a motorist has no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by [] diligent police officers," Mr. Graham had no legitimate expectation of privacy shielding the portion of his gun that was plainly visible to everyone in the public liquor store. *See Horton v. California*, 496 U.S. 128, 133 (1990) ("If an article is already in plain view, [] its observation . . . would [not] involve any invasion of privacy."); *Maryland v. Macon*, 472 U.S. 463, 469 (1985) ("respondent did not have any reasonable expectation of privacy in areas of the store where the public was invited to enter and to transact business").

Second, the cases upon which Mr. Graham relies—*Northrup*, *Ubiles*, and *Black*—are distinguishable. *Northrup* dealt with the *open* carrying of a gun in *Ohio*, whose law did not create a rebuttable presumption that such practice was illegal and did not even require gun owners to carry their licenses. *Northrup*, 785 F.3d at 1131–32. And *Ubiles* and *Black* come from other circuits, and so cannot overcome *Galaviz*'s controlling influence here.

11

## 2. The seizure of Mr. Graham's pistol and the discovery of the information in the statements that followed were inevitable.

*Arguments*

Next, Mr. Graham argues that "the firearm and statements in this case must also be suppressed as the fruits of an unconstitutional search." (ECF No. 24, PageID 83.) He notes that a "*Terry* Frisk is justified only 'where a police officer observes unusual conduct which leads him to reasonably conclude in light of his experience that the person with whom he is dealing with may be armed and *presently* dangerous.'" (ECF No. 24, PageID 83) (quoting *Terry*, 392 U.S. at 30 (emphasis Mr. Graham's) (alteration marks omitted)).

From there, Mr. Graham asserts that "'being armed does not ineluctably equate with dangerousness,' . . . especially . . . in states that permit [their] citizens to carry firearms." (ECF No. 24, PageID 84) (quoting *House*, 463 F. App'x at 788 and citing *United States v. Leo*, 792 F.3d 742, 748 (7th Cir. 2015) and *Northrup*, 785 F.3d at 1133)). He contends that the Officers did not have reason to believe he was dangerous because "[t]he moment [he] encountered law enforcement, he stood still and submitted to their authority. He did not resist when the officers grabbed his arms. He did not resist when Officer reached for [his] pocket." (ECF No. 24, PageID 83–85) (citing *United States v. Watson*, No. 19-20296, 2019 WL 3776818 (E.D. Mich. Aug. 9, 2019)).

The Government agrees that "'to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.'" (ECF No. 27, PageID 107) (quoting *Arizona v. Johnson*, 555 U.S. 323, 327 (2009)). However, in the Government's view, the Officers had such suspicion as soon as they saw that Mr. Graham was armed. (ECF No. 27, PageID 27.) "In fact," the Government states, "*Terry* does not even 'require an officer to be certain that an individual is armed before he performs a protective frisk.'" (ECF No. 27, PageID 107–08) (quoting *United States v. Noble*, 364 F. App'x 961, 965 (6th Cir. 2010)). Further, the Government notes that "once Officers Burks and Elam approached Graham and asked again about a CPL, he immediately deflected, stating repeatedly that he had just taken the gun from his son." (ECF No. 27, PageID 108–09.) Ultimately, it argues that allowing Mr. Graham to keep his gun during the Officers' encounter with him would "have been unsafe for the officers and the other patrons in the liquor store" and "was not required by the Fourth Amendment." (ECF No. 27, PageID 109) (citing *Leverett*, No. 19-cr-20098, ECF No. 36, PageID 227).

Additionally, the Government asserts that "[t]he exclusionary rule does not apply where the evidence sought to be suppressed would inevitably have been discovered through lawful means." (ECF No. 27, PageID 109) (citing *United States v. Motley*, 93 F. App'x 898, 901 (6th Cir. 2004)). It argues that "even if this Court finds that Officer Elam's seizure of Graham's gun was unlawful, the officers would inevitably

13

have seized the gun by lawful means because they had already seen the gun and asked Graham whether he had a CPL" and "[w]hether he was seized or not, Graham would have been unable to produce a CPL as required" by MCL § 28.425f. (ECF No. 27, PageID 110). Thus, it continues, the "officers would necessarily have had probable cause that [Mr. Graham] was unlicensed, which would have permitted them to seize the gun and continue their investigation separate and apart from any *Terry* stop." (ECF No. 27, PageID 110) (citing *United States v. Bridges*, No. 16-20089, 2016 WL 3922354, at *6 (E.D. Mich. July 21, 2016)).[6]

Mr. Graham replies that the Government "fails to cite a single case that supports" its claim that "being armed automatically equates to being dangerous." (ECF No. 31, PageID 151.) He also observes that Officer "Burks admitted on cross

---

[6] In its Supplemental Brief, the Government also suggests that the Officers had the right to seize the gun under the plain view exception. (ECF No. 34, PageID 233, 247); *see also United States v. Bishop*, 338 F.3d 623, 628 (6th Cir. 2003) (elaborating on the plain view exception); *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (same). But because the Government did not raise this argument in its initial Response to Mr. Graham's Motion, the Court will not consider it. *See Lake v. Cavaliere*, No. 12-CV-14976, 2013 WL 3353925, at *5 (E.D. Mich. July 3, 2013) ("According to the general rule that new arguments raised for the first time in a reply brief are not properly before the court, the argument is deemed waived." (citing *Scottsdale Inc. Co. v. Flowers,* 513 F.3d 546, 553 (6th Cir.2008)); *United States v. Schafer & Weiner, PLLC*, No. 2:19-CV-13696, 2020 WL 7770907, at *11 (E.D. Mich. Dec. 30, 2020) ("Citing Sixth Circuit precedent in considering such arguments waived, the bankruptcy court applied the well-established procedural rule that failure to raise an argument in a motion acts as a waiver of that argument . . . . The purpose of this rule is to give the other party a fair opportunity to respond to all arguments." (internal alteration and quotation marks and citation omitted)).

examination" at the Hearing "that Graham hadn't done anything to signal that he was a danger to anybody in the store" and "admitted that Graham was extremely cooperative and was not making any movements as if he were to grab the gun." (ECF No. 33, PageID 227.) But he does not reply to the Government's inevitability argument.

*Analysis*

It is not immediately clear whether the Officers reasonably concluded that Mr. Graham was dangerous before they restrained him and seized his gun. On one hand, guns are inherently dangerous weapons. And, as explained above, the officers had at least a reasonable suspicion that Graham was carrying his illegally. But on the other hand, as Mr. Graham points out, Officer Burks testified that Mr. Graham was cooperative and had not showed signs that *he* was dangerous. And even if Mr. Graham was carrying a concealed pistol without a license, that is not in itself an act of violence.

The parties have not identified, and this Court has not found, any Sixth Circuit case that deals with this specific issue. Some other circuits have held that an armed suspect is automatically a dangerous one. *See United States v. Robinson*, 846 F.3d 694, 699 (4th Cir. 2017) (*en banc*) ("[W]hen [an] officer reasonably suspects that the person he has stopped is armed, the officer is warranted in the belief that his safety is in danger." (internal quotation and alteration marks and citation omitted));

15

*United States v. Rodriguez*, 739 F.3d 489, 491 (10th Cir. 2013) ("We will not deny an officer making a lawful investigatory stop the ability to protect himself from an armed suspect whose propensities are unknown."). But there is at least some reason to question that broad conclusion. *See Robinson*, 846 F.3d at 707–16 (Harris, J., dissenting).

Ultimately, the Court need not decide that issue, because the inevitable discovery doctrine applies here. "Under [that] doctrine, if the evidence would have been lawfully discovered without the unconstitutional source, then it should be admitted." *United States v. Cooper*, 24 F.4th 1086, 1092 (6th Cir. 2022). Accordingly, the Court "must ask: [V]iewing affairs as they existed at the instant before the unlawful search [or seizure], what would have happened had the unlawful search [or seizure] never occurred[?]." *Id.* (internal quotation marks and citation omitted); *see also Nix v. Williams*, 467 U.S. 431, 444 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.").

The discovery of Mr. Graham's gun was inevitable. As explained above, the Officers had the right to stop Mr. Graham and ask him if he had a CPL as soon as they saw his concealed pistol. And they did. Michigan Law requires those carrying

16

a concealed pistol to not only *be* licensed but to "*show*" their license "upon request by [a] peace officer." MCL § 28.425f (emphasis added). So, as the Government explains, the Officers would have eventually had probable cause to arrest Mr. Graham when he clearly failed to produce a CPL—which was inevitable, because he did not have one—and would have seized the gun as part of that arrest.

The disclosure of Mr. Graham's post-pistol-seizure statements—or at least the relevant information that they expressed—was also inevitable. Indeed, Mr. Graham told the Officers that the gun was his son's *before* they ever put their hands on him and his gun. And the Officers would have discovered that Mr. Graham was on probation when processing him post-arrest. Besides his discussion of those pieces of information, Mr. Graham has not identified any other incriminating statements that he made and wishes to suppress, nor explained why he would not have made any other statements had the Officers not (arguably prematurely) seized his pistol.

## CONCLUSION

For the reasons listed above, Mr. Graham's Motion to Suppress (ECF No. 24) is **DENIED**.

**IT IS SO ORDERED.**

s/Paul D. Borman<br>
Hon. Paul D. Borman<br>
United States District Judge

Entered: September 7, 2022